IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

DEBRA J. KOEHLER,                    :              Case No. 5:13 CV 0952

        Plaintiff,               :

v.                                   :

COMMISSIONER OF SOCIAL SECURITY, :        MEMORANDUM DECISION AND ORDER
        Defendant.               :

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties

consented to have the undersigned Magistrate Judge conduct all proceedings in this case including

ordering the entry of final judgment.   Plaintiff seeks review of Defendant's final determination

denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act,

42 U. S. C. §§ 1381 *et seq*.  Pending are the Briefs of the parties (Docket Nos. 18, 21).  For the

reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On June 11, 2009, Plaintiff completed an application for DIB, alleging that she became

unable to work because of his disabling condition on October 28, 2007 (Docket No. 11, p. 14 of

862).  Her application was denied initially and upon reconsideration (Docket No. 11, pp. 83-85; 86-

88 of 862).  On December 2, 2011, Plaintiff, represented by counsel, and Vocational Expert (VE)

Elena Kurtanic, appeared before Administrative Law Judge (ALJ) M. Scott Kidd (Docket No. 11,

p. 31 of 862).  On December 21, 2011, the ALJ rendered an unfavorable decision (Docket No. 11,

pp. 11-24 of 862).  The Appeals Council denied review of the ALJ's decision on February 27, 2013

and the decision of the ALJ became a final decision (Docket No. 11, pp. 5-7 of 862).  Plaintiff filed

a Complaint in this Court seeking judicial review of the Commissioner's decision denying her

benefits (Docket No. 1).  Defendant filed an Answer and Transcript of the proceedings (Docket Nos.

10 & 11).

### III. THE ADMINISTRATIVE HEARING.

Plaintiff weighed 185 pounds and was 5'3" tall.  After obtaining her high school diploma,

Plaintiff attended night school for four months, pursuing a certification in medical office procedures.

Plaintiff resided with her husband in a single story house with a basement.  She had no independent

source of income (Docket No. 11, pp. 41; 42; 50-51 of 862).

Plaintiff had been diagnosed and/or treated for several conditions, including but not limited

to fibromyalgia[1]; an ACL[2] and meniscus tear; TMJ[3]; arthritis; anxiety and depression; lower back

pain; right leg pain; and neck pain (Docket No. 11, pp. 41; 42; 51; 52; 54; 55; 56; 59 of 842).

---

[1]
    A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites. STEDMAN'S MEDICAL DICTIONARY 148730 (27th ed. 2000).

[2]
    The ligament that extends from the anterior intercondylar area of the tibia to the posterior part of the medial surface of the lateral condyle of the femur. STEDMAN'S MEDICAL DICTIONARY 228350 (27th ed. 2000).

[3]
    Temporomandibular joint disorder relates to a disorder of the temporal bone of the skull and the hinge joint that connects the lower jaw (mandible) (STEDMAN'S MEDICAL DICTIONARY 402020; 411120 (27th ed. 2000)

When she was 26 years of age, Plaintiff suffered an injury to her kneecap.  After the initial application of a brace by an orthopedic physician, Plaintiff became accustomed to reattaching the brace when she re-injured her knee (Docket No. 11, pp. 60-61 of 862).

In 1999, Plaintiff underwent neck surgery during which cervical plating was inserted to increase fusion.  After surgery, the pain persisted, radiating down her arms to her fingers, up to her head and down the middle of her back.  Plaintiff's arms became weak as a result of the neck pain that radiated to her fingertips.  She used a neuromuscular stimulator to relieve the symptoms related to TMJ (Docket No. 11, pp. 52; 53; 58; 59; 61 of 862).

In 2010, Plaintiff underwent a second surgery to replace the plating inserted in 1999 (Docket No. 11, p. 51 of 862).  Plaintiff wore a Miami J. Cervical Collar when she was in the car to sustain her equilibrium when travelling on uneven roads.  She also used a heating pad before getting in the car (Docket No. 11, p. 42 of 862).

During the past 20 years, Plaintiff suffered with "very bad" fibromyalgia.  She described the symptoms as having the properties of chronic flu or a toothache in every part of her body.  Side effects of this disease included fatigue and chronic sleeplessness.  The pain interfered with her sleep to the extent that Plaintiff was generally unable to sleep longer than two-hour increments (Docket No. 11, pp. 55; 57-58; 64; 65 of 862).

To treat moderate to severe pain, Plaintiff took Vicodin, Percocet and Soma.  To treat the attendant inflammation, Plaintiff took a steroid.  She continued to take Xanax and she also obtained regular trigger-point injections every four to six weeks.  Plaintiff estimated that these injections helped 30% of the time (Docket No. 11, pp. 65; 67 of 862).

Plaintiff had a torn ACL and meniscus and instability in her right knee.  For a period of time

3

Plaintiff had been unable to walk without stabbing right leg pain.  Plaintiff had difficulty walking up and down the stairs to  the basement of her home.  A total hip replacement was inevitable (Docket No. 11, pp. 41-42; 54 of 862).

Plaintiff's quality of life worsened after she underwent a laminectomy at L1-S1 on December 22, 2004.  After surgery, Plaintiff had to learn to walk again.  Even with two months of therapy, the symptoms were not totally resolved.  Plaintiff learned to manage her pain and the attached restrictions (Docket No. 11, pp. 54-55 of 862).

Plaintiff also suffered from anxiety and depression for which medication was prescribed. She had undergone grief counseling in 1995 to cope with the death of friends (Docket No. 11, pp. 56; 57 of 862).

While employed as a photographer for CPI Images, Plaintiff lifted children weighing up to twenty pounds, placing them and posing them on tables.  She lifted fifty pounds when putting in a new camera.  Plaintiff quit working when she could no longer lift the children and bending precipitated problems with her knees (Docket No. 11, pp. 43, 44 of 862).

For two months, Plaintiff was employed at East Canton Medical Group as a receptionist.  In this capacity, Plaintiff was responsible for answering all calls generated in a four-line telephone system, scheduling or canceling appointments, filing documents and preparing charts.  The filing was complicated because she had to bend and squat.  When bending or squatting, Plaintiff felt pain or distress in her knees (Docket No. 11, pp. 44, 45 of 862).

Plaintiff was employed as a floral designer for several companies.  Completion of her designs was typically performed while standing.  Plaintiff lifted buckets of hydrated flowers that could weigh up to 50 pounds (Docket No. 11, pp. 47, 48 of 862).

4

Plaintiff was also employed as an office manager in a medical office.  She obtained insurance approval and completed the paperwork for a physician performing gastric bypass surgeries.  This sedentary job also required occasional filing (Docket No. 11, pp. 48, 49 of 862).

While employed in the medical office, Plaintiff completed all of the insurance paperwork except for worker compensation claims.  She monitored the completion of forms by patients and she placed patients in treatment rooms.  This job required "a lot of walking," lifting and twisting (Docket No. 11, p. 50 of 862).

Plaintiff unsuccessfully tried to run an e-Bay site in 2005.  For two weeks, she made designs and uploaded them to the computer (Docket No. 11, p. 71 of 862).

Shortly after quitting her job in 2007, Plaintiff transitioned into a life that included little physical activity.  She had insomnia which caused her to sleep during the day.  Plaintiff had to take showers because of the instability of her knees.  She had no difficulty dressing or grooming herself except for difficulty holding her head back when washing her hair in the shower.  Plaintiff was unable to help much with the household chores due to the instability of her knee.  She could not vacuum because it caused pain in her arms and back.  She only shopped with her husband's assistance.  Plaintiff could not hold her grandchildren as it was painful to grip and manipulate using her hands (Docket No. 11, pp. 61- 62; 64-66; 69 of 862).

Prior to 2007, Plaintiff religiously attended church.  Plaintiff estimated that she now attended five times annually (Docket No. 11, p. 63 of 862).  Occasionally, Plaintiff exercised by doing stretches or walking around the block.  Pain and numbness resulted from too much exercise (Docket No. 11, p. 63-64 of 862).  In fact, during the course of the hearing, Plaintiff stood up a couple of times to prevent neck spasms.  Plaintiff estimated that she could sit up to 30 minutes before needing

to stand (Docket No. 11, pp. 77 of 862).

VE Kurtanic testified that she was an impartial witness and that her testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT) (Docket No. 11, p. 72 of 862).

Initially the VE categorized Plaintiff's past relevant jobs that had involved doing significant mental or physical activities and that had lasted long enough for Plaintiff to develop the ability needed for average job performance:

| | | |
|---|---|---|
| 1. | Photographer/ Floral designer | Skilled work[4] performed at a light exertional level.[5] |
| 2. | Insurance clerk | Skilled work performed at the sedentary level.[6] |
| 3. | Physician's receptionist | Semiskilled work[7] performed at a light exertional level. |

The specific vocational preparation (SVP) or the level of time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance of

---

[4]

**Skilled work** requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. 20 C.F.R. § 416.968(c) (Thomson Reuters 2013).

[5]

**Light work** involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 416.967(b)(Thomson Reuters 2013).

[6]

**Sedentary work** involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 416.967(a)(Thomson Reuters 2013).

[7]

**Semi-skilled work** is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks. 20 C.F.R § 416.968(b) (Thomson Reuters 2013).

6

the Plaintiff's past relevant work is as follows:

| | | |
|---|---|---|
| 1. | Photographer | More than two years up to an included four years. |
| 2. | Floral designer | More than one year up to and including two years. |
| 3. | Insurance clerk | More than six months up to and including one year. |
| 4. | Physician's receptionist | More than three months up to and including six months. |

(Docket No. 11, p. 73; Www.onetonline.org/help/online/svp).

Then the ALJ posed the following hypothetical question to the VE:

If we have a hypothetical claimant limited to light work as it is typically defined, who could occasionally climb ramps and stairs and but he or she could never climb ladders, ropes, scaffolds; frequently balance, stoop, kneel, crouch and crawl; could such an individual perform any past relevant work identified?

The VE explained that this hypothetical claimant could perform all of the work previously performed. Because some of the positions are sedentary, there is no transfer to any lower exertional level since the recommended positions are at the least exertional level already.

The ALJ posed a second hypothetical question to the VE:

Keeping everything from the first hypothetical and adding that this hypothetical claimant should further be limited to simple, routine work, in a low stress environment, meaning that there would be no fast pace, high production quotas or demands, and there would be infrequent changes and any changes that did occur would be explained or demonstrated, would that eliminate past work?

The VE explained that this hypothetical claimant would be precluded from performing Plaintiff's past relevant work but he or she could perform work as a marker; a ticket taker and mail clerk. All of these positions were unskilled[8] and performed at the light exertional level. There were

---

[8] **Unskilled work** is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs. 20 C.F.R. § 416.968(a) (Thomson Reuters 2013).

more than 160,000 marker positions in the national economy and 15,000 in the State of Ohio. There were more than 100,000 ticket taker positions in the national economy and 9,000 in the State of Ohio. There were more than 170,000 mail clerk positions in the national economy and 16,000 in the State of Ohio (Docket No. 11, p. 75 of 862).

The VE concluded that:

- The hypothetical claimant's use of both hands for frequent gross and fine manipulation would not have any impact on the availability of these jobs.
- The acceptable rate of absenteeism that would be tolerated by an employer would be one day off per month.
- It was acceptable for an employee to engage in off-task behaviors 15% of the workday.
- Even if the hypothetical claimant needed to exercise a sit and stand option every 30 minutes, the hypothetical claimant could perform all past work except for that of the photographer.
- The hypothetical claimant could also perform work as a marker, ticket taker and mail clerk as those jobs permit sitting and standing at will.
- If the hypothetical claimant needed to walk around the work station at two-minute intervals, he or she was not employable (Docket No. 11, pp. 76; 77; 78 of 862).

### III. THE MEDICAL EVIDENCE.

From February 10, 1995 through February 4, 2009, Dr. Richard N. Sundheimer, M. D., D.D.S., a facial and reconstructive surgeon, treated Plaintiff for complications arising from internal tooth derangement of the TMJ. Notably, Dr. Sundheimer prescribed a TENS unit to locate possible upper body trigger points associated with fibromyalgia and on February 4, 2009, he administered an injection of a corticosteroid and an anti-inflammatory drug to relieve pain and swelling (Docket No. 11, pp. 241-246; 255 of 862; www.healthgrdes.com/physician/dr-richard-sundheimer-2bxf4).

Given her extensive history of headache and joint pain for which she treated with numerous therapeutic modalities, Dr. David C. Ash, D.D.S., an oral and maxillofacial surgeon, evaluated Plaintiff on February 33, 1995. He ordered diagnostic tests of the joint to rule out incipient

8

derangement of the right TMJ (Docket No. 11, p. 257 of 862; www.healthgrades.com/physician/dr-david-ash-xmb4m).

Results from the magnet resonance imaging (MRI) study of the cervical spine administered on April 22, 1997, showed reversal of the normal cervical lordosis centered at C6 (Docket No. 11, p. 621 of 862).

On May 12, 1997, Dr. Jean-Claude Tabet, M. D., a neurologist, noted that the MRI study of the cervical spine had some reversal of the normal cervical lordosis.  Accordingly, there was contact of the spinal cord at C5-6 and C6-7 (Docket No. 11, p. 622 of 862).

Results from the radiological study of the cervical vertebra administered on July 21, 1998 showed degenerative changes, reversal of the normal lordotic curvature,  neural foramina narrowing and with involvement of the uncovertebral (Luschka's) joints and lateral facet joints (Docket No. 11, p. 617 of 862).

On September 1, 1998, Plaintiff underwent a MRI of the cervical spine.  The radiologist noted that there were straightening and reversal of the normal cervical lordosis; small C5-6 disc herniation centrally; and a possible small central herniation at C6-7.  Dr. Tabet referred Plaintiff to the pain management unit on September 9, 1998 (Docket No. 11, pp. 609; 611-612 of 862).

Plaintiff underwent a series of cervical epidural steroid trigger point injections to prevent and soothe chronic pain and swelling.  The injections were made at the AULTMAN CENTER OF PAIN MANAGEMENT by various attending physicians on the following dates:

> September 29, 1998, October 13, 1998, October 27, 1998, October 15, 1999, January 13, 2000; October 11, 2000; November 1, 2000; November 15, 2000; September 19, 2001; October 3, 2001; May 1, 2003; June 30, 2003 and July 17, 2003 (Docket No. 11, pp. 825-845 of 862).

In December 1998, Plaintiff consulted with Dr. Tabet after experiencing continued numbness

in her arms.  At this point, Plaintiff had tried pain management and physical therapy.  Dr. Tabet discussed the risks of surgery and prescribed a Miami J. Collar on December 15, 1998 (Docket No. 11, pp. 606; 608 of 862).

Plaintiff underwent an anterior cervical diskectomy and fusion of C5-6, C 6-7 with anterior plating at C5 through C7 on January 8, 1999 (Docket No. 11, pp. 600-603 of 862).  On July 6, 1999, the alignment was excellent (Docket No. 11, p. 586 of 862).  Dr. Tabet noted on February 25, 1999, that the wound was well-healed and Plaintiff had done well with excellent relief of her symptoms in her upper extremities.  He suggested that Plaintiff could increase her lifting to approximately 20 pounds (Docket No. 11, pp. 592-593 of 862).  When the X-ray of the cervical spine taken on March 2, 1999, was compared with the X-rays of February 26, 1999, the results showed light reversal of the cervical lordosis (Docket No. 11, pp. 589; 591 of 862).

Dr. Tabet determined from the MRI study dated July 25, 1999, that there was no obvious evidence of surgical lesions but there was an L1 disc bulge present.  Dr. Tabet ordered symptomatic treatment for spondylosis and low back pain which included physical therapy with heat, massage, ultrasound and stretching (Docket No. 11, pp. 572-578; 579 of 862).

The lumbar/cervical myelogram performed on September 14, 1999, confirmed the presence of an L5-S1 disc bulge with small central disc herniation,  mild L3-4 and L4-5 disc bulges,  L1-2 disc bulge with left paracentral disc herniation and moderate midline osteophyte T12-L1, extending below the interspace (Docket No. 11, pp. 675-677 of 862).  Dr. Tabet prescribed further pain management on September 27, 1999 (Docket No. 671 of 862).

The findings from the MRI of the cervical spine performed on June 18, 2000, showed no evidence of disc herniation, spinal stenosis or intrinsic cord lesion post diskectomy and anterior fusion (Docket No. 11, p. 660 of 862).

Plaintiff underwent an anterior C5-6, C6-7 diskectomy, interbody fusion with placement of anterior fusion plate and fixative screws on May 30, 2000 (Docket No. 11, pp. 696-697 of 862).

Results from the electrodiagnostic testing administered on January 18, 2001, showed no abnormality in the left leg to account for her increased left leg pain.  Given the increased pain with presumed significant response to treatment of the muscles via trigger point injections, Dr. Pellegrino recommended further discussion with Dr. Tabet to determine if Plaintiff were a surgical candidate No. 11, pp. 654-657 of 862).

The MRI of the lumbar spine administered on March 6, 2001, to determine the etiology of Plaintiff's right leg pain and numbness, showed a medium sized posterior midline disc herniation at T13-L1 and small posterior disc herniation at L5-S1.  There was generalized bulging of the annulus at L1-2 with a small left herniated disc (Docket No. 11, pp. 644-645 of 862).

On March 6, 2001, results from the MRI of the lumbar spine also showed medium sized posterior midline disc herniation at T12-L1,  generalized bulging of the annulus at L1-2 with small left herniated disc and small posterior disc herniation at L5-S1.  The results from the MRI of the lumbosacral spine showed degenerative disc space narrowing at T12-L1 and L1-2 with small vertebral body osteophytes at L1, L2 and L5 (Docket No. 11, pp. 644-645 of 862).

Results from the lumbar myelogram administered on March 23, 2001, showed no specific findings indicative of disc herniation.  There was evidence of a bulging annulus at L2-3, L3-4 and L4-5.  The post myelogram CT scan of the T12-S1 intervertebral disc spaces revealed a small central broad based herniated disc at L5-S1; left paracentral herniated disc at L1-2; and bony ridging at the T12 vertebral body centrally (Docket No. 11, pp. 634-635 of 862).

On May 21, 2001, Dr. Mark E. Coggins, M.D., opined that at that time, there was no significant pathology that could be corrected by back surgery.  He recommended that Plaintiff

continue to utilize trigger points injection.  In addition, he prescribed a pain reliever (Docket No. 11, p. 630 of 862).

On July 8, 2002, rheumatologist Dr. Rafael E. Arsuaga, M.D., suggested the need to exclude the possibility of sarcoidosis.  His plan included physical therapy for Plaintiff's heels and plantar fascia (Docket No. 11, pp. 749-750 of 862).

On February 4, 2003, Radiologist Dr. Allen J. Rovner, M. D., determined that compared with the previous study results from January 3, 2003, the right left lung infiltrate had resolved.  In other words, there was no evidence of pneumonia (Docket No. 11, p. 776 of 862).

The MRI of the lumbar spine taken on October 9, 2003, showed (1) redemonstration of the T12-L1 and L1-2 small disc herniation; and (2) regression of the previously identified L5-S1 disc herniation (Docket No. 11, pp. 322-323 of 862).

The nerve conduction study administered on October 15, 2003, showed findings of decreased number of motor unit potentials in the left medial and lateral gastrocnemius muscles.  The findings were consistent with left S1 radiculopathy (Docket No. 11, p. 321 of 862).

The lumbosacral myelogram administered on October 21, 2003 showed mild anterior cord flattening due to focal osteophyte and disc herniation at T12-L1; small herniation at L1 of the disc; and very small posterior herniation at L5 disc (Docket No. 11, p. 319 of 862).

Plaintiff underwent a nerve block injection on November 11, 2003.  There was partial relief of the left low back and hip pain around the left S1 nerve root after the injection.  Plaintiff did not have any change in left leg symptoms (Docket No. 11, p. 713 of 862).

On December 22, 2003, Dr. Tabet performed a diskectomy which provided more room for the thecal sac.  The rest of the bones were intact and the disc spaces were preserved (Docket No. 11, pp. 316-317 of 862).

12

On February 12, 2004, Plaintiff reported to Dr. Tabet that her symptoms were 70% improved. Dr. Tabet opined that Plaintiff was ready to return to her regular work status, performing administrative work for a medical office (Docket No. 11, pp. 694-695 of 862).

To evaluate suspected bronchitis, Plaintiff underwent an echocardiogram on April 14, 2004, with the results showing trivial amounts of pericardial fluid and trace mitral and tricuspid regurgitation.  Plaintiff's left ventricle, chamber sizes and pulmonary artery systolic pressures were all normal (Docket No. 11, pp. 314-315; 370-371 of 862).

Chest X-rays administered on May 17, 2004 showed no active disease (Docket No. 11, p. 313 of 862).  The cardiac catheterization administered on May 19, 2004 showed the presence of normal coronary arteries, left ventricular function and filling pressures (Docket No. 11, pp. 311-312 of 862).          Plaintiff underwent a computed tomography (CT) scan of the pelvis on May 27, 2004. The results of the examination showed no significant hematoma or fluid collection (Docket No. 11, p. 309 of 862).

On June 10, 2004, Plaintiff underwent a follow-up examination on her post-cervical surgery. Mild instability was identified and there were only mild C4-5 disc space degenerative changes.  The degenerative changes in disc space were progressive (Docket No. 11, pp. 307-308 of 862).

The Doppler evaluation and duplex scan administered on September 23, 2005, ruled out deep or superficial venous thrombosis (Docket No. 11, p. 306 of 862).

Plaintiff complained of full body pain and her medication regimen had been modified due to some intestinal pain.  To relieve fibromyalgia flare-ups and improve Plaintiff's psychiatric quality of life, Dr. Mark J. Pellegrino, M.D., a physician who specialized in physical medicine and rehabilitation, administered trigger point injections consisting of an anesthetic and trace steroids, in six of the worst areas on these dates:

13

February 3, 2006, April 10, 2006, June 7, 2006, July 21, 2006, October 5, 2006, August 31, 2006, February 26, 2007, May 9, 2007, July 10, 2007, September 17, 2007, November 16, 2007, January 9, 2008, February 8, 2008, March 14, 2008, April 17, 2008, May 21, 2008, June 25, 2008, August 1, 2008, September 5, 2008, October, 10, 2008, November 20, 2008, December 30, 2008, March 6, 2009, April 17, 2009, May 21, 2009, July 8, 2009, September 28, 2009, November 4, 2009 and December 9, 2009.

In addition to the injections, Dr. Pellegrino monitored Plaintiff's medication regimen, discussed Plaintiff's physical impairments and counseled her on coping with flare-ups (Docket No. 11, pp. 329-337; 545-566; 807 of 862; www.healthgrades.com/physician/dr-mark-pellegrino-x2fxp).

On March 8, 2006, Plaintiff underwent a CT examination to determine the reason for chronic sinusitis and facial pain.  The results showed that her paranasal sinuses were well aerated (Docket No. 11, p. 305 of 862).

Plaintiff was treated for painful urination on January 6, 2007.  Leukocytes were detected in her urine.  The attending physician prescribed an antibiotic, rest and fluids.  Plaintiff suggested further consideration by her rheumatologist to rule out this symptom as a side effect of her medication (Docket No. 11, p. 303 of 862).

On January 25, 2007, Plaintiff presented to the emergency room with chest and left shoulder blade pain.  Plaintiff's chest X-ray showed the presence of an infiltrate and her chemistry panel results were unremarkable.  The attending physician diagnosed Plaintiff with pneumonia, gave her a baby aspirin, a gastrointestinal cocktail and an antibiotic (Docket No. 11, pp. 299-300; 301-302 of 862).

On February 23, 2007, Dr. Catharine J. Tabb, M. D., a family practitioner, noted that Plaintiff's hypertension was well-controlled with medication (Docket No. 11, pp. 273-274 of 862; www.healthgrades.com/physician/dr-catherine-tabb-3xrnq).

On July 2, 2007, Dr. Michael J. Bernard, D.D.S., M.S., an orthodontic specialist, diagnosed

14

Plaintiff with a Class II malocclusion and a slight overbite in the anterior region. Dr. Bernard opined that Plaintiff had an intracapsular problem that would not be resolved with a perfect occlusion (Docket No. 11 p. 248 of 862; www.healthgrades.com/dentist/dr-michael-bernard-ypc5q).

In September 2007, Dr. Tabb diagnosed and treated Plaintiff for otitis and sinusitis (Docket No. 11, p. 273 of 862).

Dr. Craig J. Henzel, D.D.S., opined on November 16, 2007 that Plaintiff's problems were the result of a discrepancy between the arrangement of her teeth  and her muscloskeletal system. He referred her back to Dr. Bernard (Docket No. 11, p. 254 of 862).

The MRI of Plaintiff's right knee, administered on November 21, 2007, showed, *inter alia,* small joint effusion, patellar tendinopathy, prepaterllar bursitis and torn anterior horn of the lateral meniscus with question about a degenerative tear of the posterior horn of the lateral meniscus (Docket No. 11, pp. 819-820 of 862).

On December 5, 2007, Dr. Joe L. Carpenter, D.M.D., an oral and maxillofacial surgeon, diagnosed Plaintiff with myofascial pain and mild internal derangement bilateral temporomandibular joints. Dr. Carpenter ordered a series of bilateral X-rays of the temporomandibular joint, after injection, and on December 18, 2007, Dr. James D. Geihsler, M. D., a radiologist, concluded that the left TM joint was normal and that there was a slight forward positioning of the right TM joint meniscus, not considered a complete displacement or dislocation.  Based on Dr. Geihsler's conclusions, Dr. Carpenter recommended an oral appliance that would reposition the TMJ without pain (Docket No. 11, pp. 258; 259 of 862; www.healthgrades.com/physician/dr-joe-carpenter-2plrs; www.healthgrades.com/physician/dr-james-geihsler-y9tvq).

Plaintiff underwent a bilateral TM joint arthrogram on December 18, 2007.  The results were

normal and there was a slight forward positioning of the right TM joint meniscus, not considered a complete displacement or dislocation (Docket No. 11, pp. 297-298 of 862).

On February 11, 2008, Plaintiff underwent an X-ray of the cervical spine.  There was marked reversal of the normal cervical lordosis (Docket No. 11, p. 823 of 862).

Plaintiff presented to the emergency room on May 26, 2008, with chest pains.  There was very low clinical suspicion of pulmonary embolic, acute coronary syndrome and the chest X-rays ruled out pneumonia.  There was no active pulmonary process identified (Docket No. 11, pp. 290-294; 438-442 of 862).

Dr. Arsuaga ordered special serology/virology/autoimmune testing with plans to follow her over time to see if anything suggested a connective tissue disorder or autoimmune process.  On May 10, 2007, there was no evidence of an inflammatory connective tissue disease at that point.  Preliminary results from samples collected on May 27, 2008, suggested the presence of connective tissue disease.  On June 13, 2008, Dr. Arsuaga concluded that although Plaintiff had positive results from the anti nuclear antibody test, there was no evidence of abnormality in specific auto antibodies (Docket No. 11, p. 229-238 of 862; www.healthgrades.com/physician/dr-rafael-arsuaga-x5n8h).

The MRI administered on July 28, 2008, showed remote post surgical changes at C5-C6 and C6-C7 consistent with anterior diskectomy and interbody fusion with instrumentation.  There was evidence of a minor amount of endplate spurring at C4-5 and C7-T1 (Docket No. 11, pp. 288-289 of 862).

The MRI of the spine administered on July 31, 2008 showed remote post surgical changes at C5-C6 and C6-C7 consistent with a diskectomy.  There was a minor amount of endplate spurring at C4-C5 and C7-T1 but no gross disk herniation (Docket No. 11, pp. 489-492 of 862).

Plaintiff presented to the emergency room with "pain all over" on September 11, 2008.

Ascribing the pain to an exacerbation of fibromyalgia, the attending physician administered an intramuscular injection of morphine and discharged her with a Vicodin home pack (Docket No. 11, pp. 284-287 of 862).

The CT scan of the thorax administered on February 17, 2009, showed (1) apparent focal eventration of the right hemidiaphragm anteriorly which was present dating back from May 26, 2008 and January 25, 2007 and (2) adjacent compressive atelectatic change of indeterminant significance and/or severity (Docket No. 11, pp. 282 -283 of 862).

Plaintiff presented to the emergency room on June 12, 2009 with a lump in her neck.  There were no disorders of the voice, no reported difficulty swallowing or shortness of breath.  Plaintiff was advised to follow up with her treating physician (Docket No. 11, pp. 278-281 of 862).

Plaintiff consulted with Dr. Luis J. Martino, M. D, on July 31, 2009, regarding her hyperlipidemia, arthritis and fibromyalgia.  Dr. Martino requested Plaintiff's records to assess the present state of the hyperlipidemia and he referred Plaintiff to a rheumatologist regarding arthritis and fibromyalgia symptoms (Docket No. 11, pp. 368-369 of 862).

In response to a persistent cough, Plaintiff sought emergency treatment.  The chest X-ray showed right sided diaphragmatic hernia that had increased in size.  Comprehensive atelectatic changes had developed with the right lung (Docket No. 11, p. 478 of 862).

On August 7, 2009, Plaintiff presented to the emergency room with chest pain.  She was admitted to the hospital and physician assistant, Edward Thomas, recalled that he had reviewed Plaintiff's chest X-ray three days prior and that Plaintiff had an eventration of the right diaphragm which apparently worsened.  Plaintiff was admitted to the chest pain center for a work-up.  There was no radiological evidence of adenosine-induced myocardial ischemia or myocardial infarction. Plaintiff's left ventricle was normal in size and the left ventricular ejection fraction was 75%.  There

was no evidence of acute process or significant interval change from prior images (Docket No. 11, pp. 465-477 of 862).

On August 10, 2009, Plaintiff underwent several laboratory and chemical tests.  On August 19, 2009, Dr. Suzanne Harold, M. D., an endocrinologist, ruled out Cushing's Disease and actual symptoms of hypoglycemia.  Dr. Harold also advised Plaintiff that her bone density was considered normal according to World Health Organization criteria (Docket No. 11, pp. 341-349 of 862).

The chest fluoroscopy administered on September 1, 2009 showed normal movement of the right and left hemidiaphragm (Docket No. 11, p. 460 of 862).  Although the CT scan of the thorax administered on the same date was suboptimal due to the lack of contrast, a large Morgagni hernia[9] producing adjacent lung atelectasis was evident (Docket No. 11, pp. 461-463 of 862).

On September 4, 2009, Dr. Martino ordered imaging of Plaintiff's abdomen.  No acute intra-abdominal or intrathoracic abnormalities were noted (Docket No. 11, p. 459 of 862).

The pulmonary function study administered on September 9, 2009 showed normal spirometry and no significant bronchodilator response (Docket No. 11, pp. 387-389 of 862).

On September 15, 2009, Dr. Leigh Thomas, M.D., conducted a case analysis in which she found that the medical evidence during the adjudicative period did not show any limited motion, muscle instability or weakness.  The right knee MRI showed a wavy appearance of the ACL consistent with a tear likely off the femoral.  There was insufficient evidence to show the degree of physical function for Plaintiff during the date last insured period (Docket No. 11, p. 350 of 862).

On September 16, 2009, Plaintiff consulted with Dr. Mark T. Tawil, M. D., a thoracic surgeon, on issues of shortness of breath, dry cough, constipation, chest pain and abdominal pain.

---

[9]

A Morgagni hernia is congenital, occurring in the retroxiphoid region and accounting for approximately 1-3% of all surgically treated diaphragmatic hernias.  Www.Ncbi.nlm.hih.gov.

Dr. Tawil reviewed the results from a prior CT scan and noticed the presence of bowel contents in the right chest area (Docket No. 11, pp. 362-363 of 862). Then on October 6, 2009, Dr. Tawil placed a small tube in the right chest in contemplation of reducing the hernia through a subcostal incision. On October 8, 2009, Dr. Tawil surgically repaired the right diaphragmatic Morgagni hernia. On October 29, 2009, Dr. Tawil ordered chest X-rays. There was no active chest disease. On November 9, 2009, Dr. Tawil discharged Plaintiff from his care as she was not having any new gastrointestinal symptoms and she was doing well after the procedure (Docket No. 11, pp. 360-361; 507-517 of 862). On November 24, 2009, Plaintiff treated with a pulmonary specialist, Dr. Michael Gabrilovich, M. D., Ph.D., who compared the current X-ray with the X-ray from October 29. Dr. Gabrilovich noted the complete re-expansion of the right lung and no acute cardiopulmonary abnormalities (Docket No. 11, p. 376 of 862).

Dr. Gabrilovich saw Plaintiff on September 9, 2009, November 24, 2009 and December 17, 2009, with a plan to rule out asthma and other pulmonary maladies. There was some indication that the complaints of dyspnea were related to the diaphragmatic repair. Dr. Gabrilovich recommended that Plaintiff continue treatment for rheumatoid arthritis and fibromyalgia and that she engage in physical activity, specifically, daily exercise on a treadmill, or elliptical or water exercises. The bronchial challenge study which was administered on December 10, 2009, showed normal results. In fact, there was an improvement in the absolute value of the lung capacity and there was no significant drop in the forced expiratory volume even with increased application of methacholine (Docket No. 11, pp. 356-357; 364-365; 366-367; 372; 382-386 of 862).

On January 3, 2010, Plaintiff presented to the emergency room with neck pain and arm tingling. Attending physician Dr. Geneiso Serri, M.D., believed that Plaintiff had a morbid or perverted skin sensation disorder (Docket No. 11, pp. 497-500 of 862). The CT scan of the brain

19

showed no acute intracranial hemorrhage, extra axial fluid collection or mass lesion (Docket No. 11, p. 493 of 862).  The CT scan of the cervical spine showed no acute fracture or dislocation but minimal center canal narrowing at C4-C5 and moderate to severe neuroforaminal narrowing on the right (Docket No. 11, pp. 495-497 of 862).

On January 18, 2010, Dr. Arsuaga increased the dosage of Imuran, an immunosuppressive antimetabolite, for which Plaintiff had to submit to blood work monthly (Docket No. 11, p. 530 of 862).

Plaintiff underwent a consultation at the AULTMAN CENTER FOR PAIN MANAGEMENT on June 18, 2010.  After review of her medical records and information on her options for treatment, Plaintiff decided to continue with epidural steroid injections.  On June 29, 2010, July 20, 2010 and August 9, 2010, further injections were administered (Docket No. 11, pp. 846-856 of 862).

On October 11, 2010, the CT scan of the cervical spine showed degenerative changes greatest in the right at C7-T1.  The radiologist could not rule out fracture lucency through the anterior plate at C5-6 (Docket No. 11, p. 862 of 862).

On August 11, 2009, Dr. Marianne Collins, Ph.D., a psychologist, completed the PSYCHIATRIC REVIEW TECHNIQUE form for the period from August 28, 2007 through December 31, 2007. She noted that Plaintiff had alleged depression and that this is Title II claim only with an onset date of October 28, 2007 and a date last insured of December 30, 2007.  Plaintiff was not treated for depression during this time period; accordingly, there was insufficient evidence to show a severe mental health impairment on or before the date last insured (Docket No. 11, pp. 214-226 of 862).

Dr. Cynthia Waggoner, Psy. D., conducted a "case analysis" on March 10, 2010.  Plaintiff continued to allege that her condition was worsening yet there was nothing new with respect to the mental assessment (Docket No. 11, p. 568 of 862).

20

On March 31, 2010, Dr. Eli Perencevich, D.O., concurred in Dr. Waggoner's assessment (Docket No. 11, p. 569 of 862).

Dr. Pellegrino concluded on November 30, 2011, that Plaintiff had:

- Eighteen painful tender points and therefore, she met the American College of Rheumatology's criteria for fibromyalgia.
- Reduced range of motion, tenderness, swelling, muscle spasm, muscle weakness, impaired appetite, weight change and impaired sleep.
- Emotional factors that affected the severity of her symptoms and functional limitations.
- Side effects from her medication that included increased fatigue.
- The ability to walk one block without pain; sit at one time for thirty minutes; stand at one time for ten minutes; sit about four hours; stand/walk less than two hours; walk every 30 minutes for two minutes each time; take unscheduled breaks every hour for five to ten minutes and with prolonged sitting, elevate her legs straight.
- The ability to occasionally lift and carry ten pounds or less and rarely lift 20 pounds; rarely twist, stoop, crouch/squat and climb stairs; never climb ladders;
- The incapacity for even low stress work (Docket No. 11, pp. 857-861 of 862).

## IV. THE ALJ'S DECISION.

Having considered the standard of disability, medical evidence and testimony of Plaintiff and the VE, the ALJ made the following findings of fact and conclusions of law on December 21, 2011:

1. Plaintiff last met the insured status requirements of the Act on December 27, 2007. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of October 28, 2007 through the date last insured of December 31, 2007.

2. Through the date last insured, Plaintiff had the following severe impairments: (1) fibromyalgia; (2) rheumatoid arthritis; (3) osteoarthritis of the bilateral knees with tear or partial tear of the anterior cruciate ligament; (4) cervical and lumbar degenerative disc disease; and (5) status post lumbar fusion surgery and cervical fusion surgery.

3. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.920(d), 404.925, 404.926).

4. After careful consideration of the entire record, the ALJ found that through the date last insured, Plaintiff had the residual functional capacity to perform light work as defined in 20 C. F. R. § 404.1567(b), except that Plaintiff could frequently balance, stoop, kneel, crouch, crawl, occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds.

21

5. Through the date last insured, Plaintiff was capable of performing past relevant work as an insurance clerk, having a sedentary exertional level and a SVP factor of five. This work did not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity.

6. Plaintiff was not under a disability, as defined in the Social Security Act, at any time from October 28, 2007, the alleged onset date, through December 31, 2007, the date last insured. (Docket No. 11, pp. 14-24 of 862).

## V. REVIEW BY THE APPEALS COUNCIL.

Considering the laws, regulations and ruling in effect on the date that it took action, the Appeals Council found no reason to review the ALJ's decision. The ALJ's decision denying benefits therefore became the final decision of the Commissioner on February 27, 2013 (Docket No. 11, pp. 5-7 of 862).

## VI. STANDARD OF DISABILITY DETERMINATION.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively. DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

22

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

### VII.  THIS COURT'S JURISDICTION, SCOPE AND STANDARD OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g).  The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.  *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)).  The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are

23

unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . .  *Id.*  This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### VIII.  ANALYSIS.

Plaintiff asserts two claims:

(1)     The ALJ erred in rejecting the opinions of Dr. Pellegrino, a treating physician, and
(2)     The ALJ failed to conduct proper pain and credibility analysis in light of Plaintiff's fibromyalgia.

Defendant argues that Plaintiff's argument that the ALJ should have given Dr. Pellegrino's "ultimate opinion about Plaintiff's limitations" controlling weight lacks merit.  Dr. Pellegrino rendered his opinion nearly four years after Plaintiff's insured status expired, and two days before Plaintiff's administrative hearing before the ALJ.  Defendant also contends that the ALJ's credibility determination is based on substantial evidence provided by Plaintiff.  Defendant suggests that since the ALJ followed the rules, his determination is entitled to deference.

### 1.  THE TREATING PHYSICIAN ANALYSIS.

Plaintiff acknowledges that the ALJ appropriately found that she suffered from fibromyalgia but he failed to provide good reasons for not giving his "ultimate opinion about Plaintiff's limitations" controlling weight.

### A. TREATING SOURCE RULE.

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic technique and is not inconsistent with the other substantial evidence in the claimant's case record, it will be given controlling weight. *Johnson v. Commissioner of Social Security*, 652 F. 3d 646, 651 (6th Cir. 2011) (*citing* 20 C. F. R. § 404.1527(d)(2)). "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoted with approval in Bowen v. Commissioner of Social Security*, 478 F.3d 742, 747 (6th Cir.2007)).

In *Wilson, supra,* the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.  The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.
- Identify evidence supporting such finding.
- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.  *Id.* at 546.

The Court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error, drawing a distinction between a regulation that

25

bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business. *Id.* The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error. *Id.*

### 2. TREATING SOURCE ANALYSIS.

Plaintiff argues that the ALJ appropriately attributed significant weight to Dr. Pellegrino's diagnosis of arthritis and fibromyalgia as evidenced by his findings at step two of the sequential evaluation (Docket No. 11, p. 16 of 862). However, the ALJ rejected Dr. Pellegrino's "ultimate opinion" about her limitations and failed to advance good reasons for the rejection. Plaintiff suggests that because she has fibromyalgia and a treatment relationship with Dr. Pellegrino that spans 20 years, his opinions should be given controlling weight.

When considering the scope, nature and extent of Dr. Pellegrino's relationship with Plaintiff, the ALJ acknowledged that prior to the date last insured, Dr. Pellegrino performed within the bounds of his professional certifications and that he provided a unique perspective in the treatment of Plaintiff's fibromyalgia and arthritis. Approximately four years later, Dr. Pellegrino's completed the "ultimate opinion," which provides a comprehensive summation of Plaintiff's twenty history with fibromyalgia, her reduced range of motion, her reduced ability to engage in functional limitations, her compromised emotional factors and her physical weaknesses. However, the issue here is not whether Dr. Pellegrino's "ultimate opinion" is entitled to controlling weight; the dispositive issue is whether the "ultimate opinion" is relevant to the determination of disability prior to the expiration of Plaintiff's insured status.

It is well-established that medical evidence is relevant to prove a disability only while the claimant enjoyed insured status. *Anderson v. Commissioner of Social Security*, 440 F.Supp.2d 696, 699 (E.D.Mich.,2006) (*citing Estep v. Weinberger*, 525 F.2d 757, 757–58 (6th Cir.1975)). Medical

26

evidence that postdates the insured status date may be, and ought to be, considered, insofar as it bears on the claimant's condition prior to the expiration of insured status.  *Id.* (*citing Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir.1976) (stating that "[m]edical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time"); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988)).

Apart from the injections, the only evidence of Plaintiff's condition that Dr. Pellegrino could discuss was her diagnosis of fibromyalgia, a claim that the ALJ found to be fully credible.  Plaintiff applied for Title II benefits which are calculated from the onset date through the date last insured on December 31, 2007.  This is the only time that the ALJ was bound to consider.  Dr. Pellegrino's "ultimate opinion" was published on November 30, 2011, and it reflects on Plaintiff's latter health condition and the treatment she received after the expiration of her insured status.  Plaintiff failed to cite to anything in the "ultimate opinion" that is sufficiently probative of the temporal relationship during the period when she met the statutory special earnings requirements.

The ALJ did not err by failing to give controlling weight to Dr. Pellegrino's "ultimate opinion" for the reason that it was not relevant to her proof of disability before the expiration of her insured status.  Plaintiff's first claim lacks merit.

### 2.  CREDIBILITY DETERMINATION.

Plaintiff argues that the diagnosis of fibromyalgia carries with it an irrefutable presumption of widespread and severe pain.  Her pain, as documented by her treating physician and corroborated by her disease, constitutes an independent impairment.  In this case, the ALJ should have a more thorough and balanced evaluation of Plaintiff's credibility considering all of the factors in 20 C. F.

R. § 20 C. F. R. 404.1529(c)(3) and assessing whether her pain is an impairment.

### A.  PAIN AS A CAUSE OF DISABILITY.

When a claimant presents pain as the cause of disability, the decision of the Sixth Circuit in *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir.1986), provides the proper analytical framework.  *Wines v. Commissioner of Social Security*, 268 F.Supp.2d 954, 956 (N.D.Ohio,2003).  The Court in *Duncan* established the following test:

> [t]here must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Id*. (*citing Duncan,* supra, 801 F.2d at 853).

Under the first prong of this test, the claimant must prove by objective medical evidence the existence of a medical condition as the cause for the pain.  *Id.*  Once the claimant has identified that condition, then under the second prong he or she must satisfy one of two alternative tests—either that objective medical evidence confirms the severity of the alleged pain or that the medical condition is of such severity that the alleged pain can be reasonably expected to occur. *Id.* at 956-957 (*citing Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir.1994)).

Objective medical evidence of pain includes evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption.  *Id.* at 957 (*citing Felisky*, 35 F. 3d at 1037) (*quoting* 20 C.F.R. 404.1529(c)(2)).  The determination of whether the condition is so severe that the alleged pain is reasonably expected to occur hinges on the assessment of the condition by medical professionals.  *Id.* (*citing Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997)).

A claimant's failure to meet the *Duncan* standard does not necessarily end the inquiry,

however.  *Id.*  As the Social Security Administration has recognized in a policy interpretation ruling on assessing claimant credibility, *Id.* (*citing* SOCIAL SECURITY RULING (SSR) 96–7P, EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS:  ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 61 Fed.Reg. 34483 (July 2, 1996)).  In the absence of objective medical evidence sufficient to support a finding of disability, the claimant's statements about the severity of his or her symptoms will be considered with other relevant evidence in deciding disability.  *Id.*  In fact, because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.  *Id.* (*citing* SSR 96–7p, Fed.Reg. 34484).

### B.  PLAINTIFF'S PAIN.

Plaintiff suggested but failed to identify a special standard for assessing credibility given the elusive and mysterious nature of fibromyalgia.  The ALJ followed the procedure established in SSR 96-7p, initially finding that the pain-producing impairment was demonstrated by objective medical evidence and that there was a relationship between the impairment and the pain alleged.  It is undisputed that Plaintiff's fibromyalgia was an impairment capable of producing pain.  The ALJ acknowledged this fact.  Since the appropriate nexus does exist, the ALJ proceeded to consider all the evidence presented to determine whether Plaintiff's pain was in fact disabling (Docket No. 11, pp. 19-23 of 862).

With respect to the first component of the inquiry, the objective impairment prerequisite, the ALJ fulfilled this requirement without regard to subjective evidence.  Specifically, he considered

29

Plaintiff's daily activities (Docket No. 11, pp. 21-22 of 862); the location, duration, frequency, and intensity of her pain and other symptoms (Docket No. 11, pp. 20-22 of 862); factors that precipitated and aggravated her symptoms (Docket No. 11, pp. 20; 21; 22 of 862); the type, dosage, effectiveness, and side effects of any medication Plaintiff took and the non-medicinal palliatives used to alleviate pain or other symptoms (Docket No. 11, p. 20 of 862).

The second component, a nexus between the impairment and the alleged pain, was examined taking into account the subjective allegations of pain as true.  The third component-considering all evidence presented-required the ALJ to consider all medical data presented, any other objective indications of pain, and subjective accounts of the severity of the pain (Docket No. 11, pp. 20-22 of 862).

Because the objective medical evidence does not substantiate that Plaintiff was disabled by her alleged symptoms, the ALJ was required to assess Plaintiff's credibility.  He did not summarily reject Plaintiff's testimony because it was not fully corroborated by objective medical findings or the evidence as a whole.  Rather the ALJ found that Plaintiff's subjective complaints probative of her credibility, a decision he supported by clear and convincing reasons for doing so.

The Magistrate does not find error in the ALJ's credibility assessment.  Plaintiff's second claim lacks merit.

### IX. CONCLUSION.

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 23, 2014

30